FILED
United States Court of Appeals
Tenth Circuit

February 21, 2024

Christopher M. Wolpert
Clerk of Court

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

MICHAEL BALLOU; HENRY
MARTINEZ; MATTHEW SPINNATO;
CESAR RICANO; JERRY PORCHIA;
DAVID GOODNIGHT; DANA MOYE,

  Plaintiffs - Appellants,

v.

UNITED PARCEL SERVICE, INC.,

  Defendant - Appellee.

No. 23-3021
(D.C. No. 2:20-CV-02640-JWB)
(D. Kan.)

_____

## ORDER AND JUDGMENT[*]

_____

Before **EID**, **CARSON**, and **ROSSMAN**, Circuit Judges.

_____

Plaintiffs-Appellants are employees of Defendant-Appellee United Parcel

Service, Inc. (UPS).  They sued UPS, alleging UPS misrepresented the pay and hours

they would receive while recruiting them, then did not make good on those promises

after they accepted employment.  The district court granted UPS's motion for

summary judgment, concluding Appellants' claims are preempted by the National

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
submitted without oral argument.  This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel.  It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

Labor Relations Act (NLRA) under the doctrine of *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959).  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  Background

### A.  Factual Background

Appellants were hired by UPS as "feeder" drivers in late 2018.  In UPS's operations, "feeder" driving means driving 18-wheel vehicles transporting packages between "hub" locations, rather than transporting packages from a "hub" to customers.[1]  Appellants allege they left other employment to take positions with UPS in reliance on representations made during "recruitment" meetings they attended during the fall of 2018.  *See* Aplt. App., vol. I at 58, vol. VI at 1571–72.  Specifically, Appellants allege they applied for and accepted positions with UPS in reliance on its representations that (1) they would be paid $30 per hour for all feeder driving work; (2) in the event they were laid off from feeder driving hours, they would be paid $25 per hour for other work done within the hub; and (3) their positions were guaranteed to be full-time (at least 40 hours per week).

Appellants are part of a collective bargaining unit and members of the International Brotherhood of Teamsters, Local 41 (the Union).  The Union has exclusive bargaining authority, and Union representatives attended the 2018 recruitment meetings.

---

[1] The factual background is drawn from the summary judgment record and is undisputed except where attributed to only one party or otherwise noted.

When applying, Appellants were advised—and acknowledged—their positions are subject to a collective bargaining agreement (CBA).  The CBA includes provisions addressing pay, hours, and job protection.[2]  It provides wage progressions applicable to Appellants, with rates that start at $21 per hour and increase with seniority.  The CBA also includes terms related to layoffs and job security, including restrictions on how feeder drivers may be laid off if UPS decides to move packages between hubs using alternate means of transportation, and a requirement that UPS notify and meet with the Union "prior to any change in its operation that will result in . . . possible layoff of seniority employees."  Aplt. App., vol. I at 250.  The CBA prohibits "Extra Contract Agreements," stating UPS may not "enter into, or attempt to enter into, any agreement or contract with its employees . . . which in any way conflicts with the provisions of [the CBA]," and that any such agreements are "null and void."  *Id.* at 122.  It also establishes grievance-arbitration procedures.

### B.  Appellants' Claims

After Appellants were hired, UPS initially paid them $30 per hour for feeder driving.  UPS maintains that wage was based only on a temporary "market rate adjustment" (MRA), which raised Appellants' pay for feeder driving above the rates set by the CBA.  Appellants maintain that during the recruitment meetings, UPS's

---

[2] The terms and conditions of Appellants' employment are covered by three separate agreements, including a "National Master" collective bargaining agreement, together with regional and local supplemental agreements.  For purposes of this appeal, we refer to these agreements together as the CBA.

representative was unaware the $30 per hour rate would expire and told them their pay would likely *increase* above $30 per hour in the future.

In 2019, Appellants were laid off from feeder driving hours at various intervals. During their layoff periods, all but one accepted at least some alternate work in the "hub." UPS paid them approximately $15 per hour for that work—less than the $25 per hour allegedly promised. In addition, for feeder driving hours worked after the MRA rate expired (in approximately March 2020) UPS paid Appellants the lower CBA hourly rate, then $23 per hour. Appellants also allege UPS did not give them consistent or guaranteed full-time hours, and that at times they worked as little as one day per week.

### C. NLRB Charges

At least two unfair labor practice charges were filed with the National Labor Relations Board (NLRB) based on the events described above.

First, after Appellant Henry Martinez filed grievances pursuant to the CBA's grievance-arbitration procedures, he filed an NLRB charge against the Union, alleging the Union had violated the NLRA by refusing to process his grievances "regarding market rate adjustments for drivers and pay rates for work performed in the hub," and by "refusing to document and reduce to writing a supplemental agreement regarding market rate adjustments and pay rates for work in the hub." Aplt. App., vol. IV at 1012.

The NLRB dismissed Mr. Martinez's charge, finding no NLRA violation by the Union. The NLRB characterized his grievances as claiming that (1) the MRA pay

4

adjustment was "an improper, unwritten side agreement," and (2) he and other "new hires" did not receive $25 per hour for hub work. *See* Aplt. App., vol. IV at 1014. As to feeder driving pay, the NLRB stated, "MRAs are instituted entirely at the Employer's discretion and are not negotiated with the Union." *Id.* As to hub pay, the NLRB concluded that although UPS had "reneged on a verbal commitment to deviate from the contractual wage rate," the Union was "under no obligation either to refuse to consent to the modification in the first instance or, even after consenting, to enforce that commitment." *Id.* The NLRB also concluded that although "oral agreements to modify a collective bargaining agreement could be enforced pursuant to Section 8(d) of the [NLRA], the Union [had not] commit[ted] a violation by failing or refusing to file an unfair labor practice charge." *Id.* at 1014–15. Mr. Martinez appealed administratively, and the NLRB denied his appeal.

Second, after Mr. Martinez and other Appellants filed grievances under the CBA procedures contesting reduction of the $30 per hour rate for feeder driving, the Union filed an NLRB charge. The Union's charge alleged the reduction of feeder driver pay was an unfair labor practice violating Section 8(a)(1) and (5) of the NLRA, and that UPS had "failed and refused to bargain in good faith with the union . . . by making unilateral changes in terms and conditions of employment." *Id.* at 1023. The NLRB deferred proceedings on this charge because of ongoing efforts to resolve the dispute through the grievance-arbitration procedure. The Union and UPS then resolved the dispute, on terms that provided back pay to affected drivers (including all of the Appellants) and returned their pay to $30 per hour. After

5

reaching that resolution, the Union asked to withdraw its NLRB charge and the NLRB approved.

### D. Procedural History

On September 4, 2020—while the Union's NLRB charge was deferred— Appellants filed this case, bringing claims against UPS in Kansas state court for fraud/intentional misrepresentation, fraud by silence, and negligent misrepresentation.[3] UPS removed to federal district court based on 28 U.S.C. § 1332 (diversity jurisdiction) and 28 U.S.C. § 1331 (federal-question jurisdiction),[4] and then moved to dismiss on various grounds, including preemption under *Garmon*. The district court denied UPS's motion to dismiss and the case proceeded to discovery. UPS moved for summary judgment, renewing its *Garmon* argument, and the district court granted that motion, concluding all of Appellants' claims were preempted under *Garmon*. It therefore dismissed all claims without prejudice.[5] This appeal followed.

---

[3] Appellants also pled a claim under the Kansas Wage Payment Act, but did not pursue the claim in district court.

[4] Because we are satisfied the district court had diversity jurisdiction under § 1332, we do not address whether it also had jurisdiction under § 1331.

[5] UPS's summary judgment motion also argued Appellants' claims are preempted under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and that it was entitled to summary judgment on the merits of the claims. UPS maintains those alternative arguments on appeal. Because we resolve the appeal on the basis of *Garmon* preemption, we do not reach these other issues.

## II. Legal Standards

### A. Summary Judgment

We review a grant of summary judgment de novo, applying the same standard as the district court. *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1213 (10th Cir. 2022). We draw all reasonable inferences in favor of the non-moving party and "will affirm the grant of summary judgment only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

However, the nonmovant "may not simply rest upon its pleadings." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). If the movant carries "the initial burden of . . . [demonstrating] entitlement to judgment as a matter of law," then "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts . . . from which a rational trier of fact could find for the nonmovant." *Id.* at 670–71 (internal quotation marks omitted).

### B. Unfair Labor Practices under the NLRA

Section 7 of the NLRA protects employees' rights to collectively bargain, *see* 29 U.S.C. § 157, and Section 8 prohibits "unfair labor practices," *see* 29 U.S.C. § 158(a). Among other prohibitions, Section 8 makes it unlawful for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]," § 158(a)(1), or to "refuse to bargain collectively with the representatives of [its] employees," § 158(a)(5). Parties to collective bargaining are required to "confer in good faith with respect to wages, hours, and other terms and

conditions of employment." § 158(d). Parties to a collective bargaining agreement also must comply with certain notice and conferral obligations if modifying an existing agreement. *See* § 158(d).

## C. *Garmon* Preemption

The NLRA does not "'merely lay down a substantive rule of law to be enforced by any tribunal . . . .'" *Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 389 (1986) (quoting *Garner v. Teamsters*, 346 U.S. 485, 490 (1953)). Rather, it "confide[s] primary interpretation and application of its rules to a specific and specially constituted tribunal," namely, the NLRB. *Garner*, 346 U.S. at 490.

State law claims like those here "rais[e] the specter that state law will say one thing about the conduct underlying the dispute while the NLRA says another." *Glacier NW, Inc. v. Int'l Brotherhood of Teamsters Local Union No. 174*, 598 U.S. 771, 776 (2023). "It is a bedrock rule . . . that federal law preempts state law when the two conflict." *Id.* However, preemption under the NLRA is "unusual" and "goes beyond the usual preemption rule," in that under Supreme Court precedent, "the NLRA preempts state law even when the two only *arguably* conflict." *Id.*

In *Garmon*, the Supreme Court held that, "[w]hen an activity is arguably subject to [Section] 7 or [Section] 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the [NLRB]." 359 U.S. at 245. Thus, "when properly invoked," *Garmon* "tells us not just what law applies (federal law, not state law) but who applies it (the [NLRB], not the state courts or federal district courts)." *Glacier*, 598 U.S. at 777 (internal quotation marks omitted). This is true

8

even where "'it has not been clear whether the particular activity . . . was governed by § 7 or § 8 or was, perhaps, outside both these sections.'" *Davis*, 476 U.S. at 389 (quoting *Garmon*, 359 U.S. at 244). "Even in such ambiguous situations . . . courts are not primary tribunals to adjudicate such issues," which must "be left in the first instance to the [NLRB]." *Davis*, 476 U.S. at 389–90 (internal quotation marks omitted).

A party asserting *Garmon* preemption has the burden to show it applies. *See Glacier*, 598 U.S. at 779. This "requires more than a conclusory assertion that the NLRA arguably protects or prohibits conduct." *Id.* at 776 (internal quotation marks omitted). A party asserting *Garmon* preemption "is required to demonstrate that his case is one that the [NLRB] could legally decide in his favor." *Davis*, 476 U.S. at 395. To do so, the party must: (1) "advance an interpretation of the Act that is not plainly contrary to its language and that has not been authoritatively rejected by the courts or the [NLRB]," then (2) "put forth enough evidence to enable the court to find that the [NLRB] reasonably could uphold a claim based on such an interpretation." *See id.* (internal quotation marks omitted).[6]

*Garmon* preemption is jurisdictional. *See id.* at 391. "If *Garmon* preemption applies, the correct result is that neither the federal court nor the state court has

---

[6] *Sears, Roebuck & Co. v. San Diego County District Council of Carpenters*, 436 U.S. 180, 190–97 (1978), addressed the different considerations and analyses applicable for *Garmon* preemption depending on whether an activity is arguably *prohibited* by the NLRA or arguably *protected* by it. The issue here is whether UPS's actions were arguably prohibited.

jurisdiction; the case must be adjudicated before the NLRB." *Felix v. Lucent Techs.,* 387 F.3d 1146, 1166 (10th Cir. 2004).

### III. Discussion

We agree with the district court that Appellants' claims are subject to *Garmon* preemption.

### A. Applications of *Garmon* to Fraud Claims

In assessing *Garmon* preemption, "[t]he critical inquiry . . . is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to . . . that which could have been . . . presented to the [NLRB]." *Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 197 (1978).

Applying this test, tort claims against employers—including for fraud and misrepresentation—have been held to be preempted under *Garmon*. *See, e.g.*, *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 661 (7th Cir. 1992) (holding common law fraud and misrepresentation claim preempted). "[A]llowing state law fraud claims for conduct that would also be a violation of the employer's duty to bargain in good faith [under Section 8] would necessarily undermine the [NLRB's] exclusive jurisdiction and may subject the employer to conflicting substantive rules." *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1518 (11th Cir. 1988) (holding common law fraud and misrepresentation claims preempted).

This court has not had occasion to apply *Garmon* in the context presented here. But courts in other circuits have examined the allegations underlying state law fraud

10

and misrepresentation claims and held them preempted when an employer's alleged misrepresentations present a clear or arguable violation of the NLRA.

For example, in *Serrano v. Jones & Laughlin Steel Co.*, 790 F.2d 1279 (6th Cir. 1986), employees alleged the employer induced the union to agree to concessions by promising a plant would remain open, while withholding information relevant to its potential closure. *See id.* at 1281–83. After the plant closed, the employees brought fraud claims, which were held preempted because "the gravamen of the . . . fraud charges is that [the employer] did not bargain in good faith in obtaining concessions from the Union"—conduct arguably prohibited under Section 8. *Id*. at 1286.

Similarly, in *Kolentus v. Avco Corp.*, 798 F.2d 949 (7th Cir. 1986), retirees brought fraud claims alleging their former employer did not disclose an expected plant closure while negotiating terms for pension plans that were terminated when the plant closed. *See id.* at 952–53. The Seventh Circuit held those claims preempted under *Garmon*, finding them "indistinguishable from an unfair labor practice claim that could have been pursued before the NLRB," and noting the "key inquiry" for either the fraud claims or an NLRB charge would be whether the employer wrongfully withheld relevant information while negotiating on issues subject to Section 8's obligation to bargain in good faith. *Id.* at 961.

More recently, in *Moreno v. UtiliQuest, LLC*, 29 F.4th 567 (9th Cir. 2022), the Ninth Circuit held that a terminated employee's fraud and misrepresentation claims against his employer were preempted under *Garmon*. Mr. Moreno claimed his

11

employer had asked him to have coworkers sign a "union release," promising they would receive a raise in exchange, then gave the raise to Mr. Moreno but not to his coworkers. *See id.* at 572–73. The Ninth Circuit concluded the claims "touch[ed] on conduct clearly covered by the NLRA." *Id.* at 575. Although the focus of the claims was on allegedly deceptive statements made to the plaintiff, rather than whether the employer's conduct was unlawful under the NLRA, the court could not "ignore the subject of [the employer's] alleged deception." *Id.* at 574. It described the allegation of "offering employees a benefit to give up their union rights," as "a textbook NLRA violation." *Id.* To resolve the tort claims, "a jury would need to determine whether [the employer] made the misrepresentation, and such a finding would strongly suggest an NLRA Section 8 violation." *Id.*

The court in *Moreno* distinguished the claims it held preempted from those held not preempted in *Milne Employees Ass'n v. Sun Carriers*, 960 F.2d 1401 (9th Cir. 1991). In *Milne* the court determined the subjects of an employer's alleged misrepresentations—including an impending plant closure and other "managerial decisions"—were *not* mandatory subjects of bargaining, so the employer had not breached a duty under the NLRA to bargain in good faith on those issues. *Id.* at 1414–15. The claims based on those misrepresentations therefore were not preempted under *Garmon*. *Id.* at 1415.

## B.  Preemption Analysis

Turning to the allegations here, we evaluate whether Appellants' fraud and misrepresentation claims are "identical to [the controversy] which could have

12

been . . . presented to the [NLRB]" as an alleged NLRA violation.  *See Sears*,

436 U.S. at 197.  In doing so, we look to the subject matter of UPS's alleged

misrepresentations, *see Moreno*, 29 F.4th at 574–75, and whether resolution of their

tort claims would present the same "key inquiry" as an NLRB charge, *see Kolentus*,

798 F.2d at 961.

Appellants pled three causes of action:  negligent misrepresentation, fraud or

intentional misrepresentation, and fraud by silence.  Each requires them to show UPS

either negligently or fraudulently gave them false information or intentionally

withheld facts it was obliged to provide.  *See Rinehart v. Morton Bldgs., Inc.*,

305 P.3d 622, 630 (Kan. 2013) (stating elements of negligent misrepresentation);

*Bomhoff v. Nelnet Loan Servs., Inc.*, 109 P.3d 1241, 1246 (Kan. 2005) (stating

elements of fraud); *Stechschulte v. Jennings*, 298 P.3d 1083, 1097 (Kan. 2013)

(stating elements of fraud by silence).  All of the claims are based on the same

alleged misrepresentations by UPS relating to wages and hours, which are issues

addressed in the CBA and also mandatory subjects of collective bargaining.  *See*

29 U.S.C. § 158(d); *Facet Enters. v. NLRB*, 907 F.2d 963, 975 (10th Cir. 1990)

(stating mandatory subjects of negotiation include those "regulating wages, hours and

working conditions").

As discussed above, the gravamen of Appellants' claims is that UPS recruited

them by promising pay and hours better than those provided by the CBA, then broke

those promises after they accepted positions and became bargaining unit members.

UPS argues these claims "complain of activity arguably covered by [Section 8] of the

13

NLRA," including "bypassing the bargaining representative and dealing directly with an employee," Aplee. Br. at 7, and that Appellants' claims of misrepresentations regarding pay and hours "are, by definition, complaints that UPS failed to bargain in good faith with the bargaining representative about subjects covered by the CBA," *id.* at 9.

Considering the circumstances of this case, we agree that Appellants' claims raise an arguable violation of Section 8, including prohibited "direct dealing," *see Facet Enters.*, 907 F.2d at 969 ("An attempt by the employer to bypass the bargaining representative in conducting negotiations constitutes direct dealing, a violation of § 8(a)(5) of the Act."), or, more broadly, a failure to confer in good faith on mandatory subjects of bargaining, *see* § 158(d).[7]

Our conclusion is consistent with the out-of-circuit cases cited above applying *Garmon* preemption to fraud claims based on an employer's alleged

---

[7] If we construe Appellants' claims as alleging UPS orally modified the CBA (as the NLRB suggested when resolving Mr. Martinez's charge), we still conclude the alleged conduct was arguably prohibited by the NLRA. Appellants claim UPS made misrepresentations about pay and hours, never intending to fulfill them. However pled or construed, we conclude this alleged conduct would be an arguable violation of Section 8, which requires notice and an offer to confer when seeking to modify an existing agreement. *See* § 158(d)(1) & (2). Any agreement UPS made with Appellants in conflict with the CBA's terms would also appear to violate the CBA's prohibition against such "Extra Contract Agreements." *See* Aplt. App., vol. I at 122. A unilateral pay increase would also raise an arguable NLRA violation. *See NLRB v. John Zink Co.*, 551 F.2d 799, 802 (10th Cir. 1977) ("Unilateral [pay] increases are violations of the duty to bargain unless the company granted them as part of a long-standing, non-discretionary pattern of pay raises."); *see also* Aplt. App., vol. IV at 1023 (Union's NLRB charge, alleging UPS "failed and refused to bargain in good faith with the union . . . by making unilateral changes in terms and conditions of employment").

14

misrepresentations.  As in *Moreno*, we conclude that "the subject of [UPS's] alleged deception" and the "elements of misrepresentation and [fraud] in the state law claims" implicate a likely NLRA violation.  *See* 29 F.4th at 574.  To resolve the Appellants' claim, "a jury would need to determine whether [UPS] made the misrepresentation, and such a finding would strongly suggest an NLRA Section 8 violation."  *See id.*  Thus, Appellants' claims rest on the same "key inquiry" the NLRB would need to undertake if evaluating an unfair labor practice charge based on the same conduct.  *See Kolentus*, 798 F.2d at 961.

Our conclusion is supported by the fact that two of the three related misrepresentations raised in plaintiff's tort claims were, in fact, presented to the NLRB as claims of an NLRA violation before Appellants filed this case.  *See Parker*, 855 F.2d at 1517 (applying preemption where employees had filed NLRB charges; noting "the employees, through artful drafting, have recast the same claims and factual allegations into state law fraud claims," and that "[b]y initially pursuing relief with the NLRB the employees have implicitly recognized the Board's jurisdiction over their claims."); *Talbot*, 961 F.2d at 661 (finding Union's NLRB filing supported conclusion employees' claims raising the same allegations were preempted).

As to Mr. Martinez's charge, the NLRB investigated, and although it found *the Union* had not violated the NLRB, its determination suggests an arguable violation of Section 8 by UPS, including that UPS "reneged on a verbal commitment to deviate from the contractual wage rate," and potentially entered into "oral agreements to modify [the CBA]" which UPS did not honor.  *See* Aplt. App., vol. IV at 1014.  As to

15

the Union's charge, the NLRB concluded the allegations overlapped sufficiently with the grievance-arbitration proceedings addressing feeder driving pay to defer the NLRB proceedings. UPS then resolved the claims in the Union's favor, providing relief to all Appellants. In these circumstances, we conclude both that the NLRB treated the Union's charge as raising an arguable Section 8 violation, and that UPS and the Union believed the NLRB could resolve the charge in the Union's favor.

Therefore, we are persuaded Appellants' tort claims are subject to *Garmon* preemption. UPS has satisfied its burden by providing an interpretation of the NLRA that is not plainly contrary to its language and that has not been authoritatively rejected, and has shown the NLRB could reasonably have upheld a claim on that basis. *See Glacier*, 598 U.S. at 779; *Davis*, 476 U.S. at 395.

### C. Appellants' Arguments

Appellants' counter-arguments are unpersuasive. Appellants do not distinguish, or even mention, cases cited by the district court in which analogous fraud claims were held preempted under *Garmon* (including *Moreno* and *Talbot*). Other than the conclusory statement that the grievance and NLRB proceedings do not "automatically" show their claims were preempted, Aplt. Br. at 20, Appellants do not explain how their fraud and misrepresentation claims differ from the allegations that could have been, and were, presented to the NLRB as claims of NLRA violations.[8]

---

[8] The Supreme Court has recognized exceptions to *Garmon* preemption, including "where the activity regulated was a merely peripheral concern of the [LMRA]," or "touched interests . . . deeply rooted in local feeling and

Appellants emphasize they were not yet UPS employees when UPS made the alleged misrepresentations. But they cite no authority that forecloses the NLRB from finding an NLRA violation on this basis (*i.e.*, misrepresentations regarding pay and hours made while recruiting employees who then became bargaining unit members). Moreover, Appellants' claims only arise because UPS allegedly reneged on its commitments *after* they became UPS employees and bargaining unit members subject to the CBA. As noted, Union officials were present at the recruitment meetings, the Union is the exclusive bargaining representative, and Appellants acknowledged their positions would be subject to a CBA when applying.[9] Given these facts, Appellants' claims present an arguable violation of Section 8. *Cf. Kolentus*, 798 F.2d at 952, 960–61 (applying *Garmon* preemption to fraud claims brought by former employees, rather than by present employees).

Appellants also argue the district court erred by applying an "apparent misunderstanding of 'side-dealing,'" Aplt. Br. at 17, and that they "did not [n]egotiate Side-Deals" with UPS," *see id.* at 21–23. Their argument is conclusory and cites no legal authority, but we understand them to argue that because they never alleged direct dealing themselves, and because they did not understand themselves to

---

responsibility." *See Garmon*, 359 U.S. at 243–44. Appellants do not argue either of these exceptions apply, so we do not address them.

[9] At the district court Appellants did not dispute having acknowledged their work would be subject to an applicable CBA. We therefore treat it as an undisputed fact. Although Appellants state on appeal they "were not made aware of either the MRA or the collective bargaining agreement until **after** the commencement of their employment," the portions of the record they cite at most show they were not given copies of the CBA or made familiar with its terms. *See* Aplt. Br. at 11.

be directly negotiating with UPS, their claims should not be preempted. Initially, we note this argument is in some tension with the NLRB charge in which Mr. Martinez alleged there was an unwritten "supplemental agreement." Aplt. App., vol. IV at 1012. Moreover, even if Appellants did not believe themselves to be engaged in direct dealing, their allegations still present an arguable claim UPS violated *its* duty not to do so. *See Facet Enters.*, 907 F.2d at 969 ("The fundamental inquiry in a direct dealing case is whether *the employer* has chosen to deal with the Union through the employees, rather than with the employees through the Union." (emphasis added) (internal quotation marks omitted)). Given that Appellants neither cite legal authority nor point to facts showing the NLRB would be precluded from finding a Section 8 violation based on their allegations, their position on direct dealing does not change our conclusion that *Garmon* preemption applies.

Finally, Appellants emphasize that the district court had initially concluded *Garmon* preemption did not apply when denying UPS's motion to dismiss, before later granting its motion for summary judgment. The earlier ruling does not change our analysis here. *See Lindsey v. Dayton-Hudson Corp.*, 592 F.2d 1118, 1121 (10th Cir. 1979) ("We see no merit in the contentions that summary judgment was improper because a motion to dismiss, or an earlier motion for summary judgment, which raised the same issues, had been denied.").

## IV.  Conclusion

For the foregoing reasons, we affirm the district court's dismissal of Appellants' claims.

Entered for the Court


Allison H. Eid
Circuit Judge